UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOHN YARBERRY,

              Plaintiff,                         Case No. 1:12-cv-611

      v.                                          Weber, J.
                                                Bowman, M.J.

GREGG APPLIANCES, INC.,

              Defendant.

**REPORT AND RECOMMENDATION**

    Plaintiff brings this action through counsel against his former employer, defendant Gregg Appliance, Inc. ("hhgregg") alleging that hhgreeg discriminated against him on the basis of his alleged disability in violation of the Americans with Disabilities Act ("ADA"). This matter is now before the Court on the parties' cross motions for summary judgment (Docs. 40, 41), as well as their responsive memoranda and supporting documentation. (Docs. 35-39, 42, 46, 47, 48, 49, 51, 54, 55).[1] The parties appeared before the Court for oral argument on the cross motions for judgment on February 13, 2014.

    **I. Background and Facts**

    hhgregg hired Plaintiff on October 25, 2010. (Doc. 42, Ex. A, Yarberry Dep., 32:7-10, 33:17-25.) In the Summer of 2011, hhgregg offered Plaintiff a lateral transfer

---

[1] The parties have submitted extensive briefing in support of their cross-motions for judgment. The undersigned has thoroughly reviewed the entire record before the Court, including all relevant facts, arguments and caselaw. Notably, this Report and Recommendation does not address every argument raised by the parties in their briefs and at oral argument, but instead, focuses on the arguments and caselaw deemed dispositive.

from his Electronic Sales Manager position in Cincinnati, Ohio to the position of Appliance Sales Manager at its Cranberry, Pennsylvania store. (*Id.* 39:16-40:16.) Plaintiff first reported to work at the Cranberry store on August 1, 2011. (*Id.* 44:12-15, 46:21-25.)

In his new position, Plaintiff's direct supervisor was General Manager Tim Klinsik. (Yarberry Dep. 46:21-23.)  Klinsik, who was on vacation at the time of Plaintiff's transfer, reported to Regional Manager Brett Edger. (Yarberry Dep. 47:1-5.) At the time Plaintiff reported to work in Cranberry, his interactions with Edger had been limited to two or three phone calls and a single email exchange. (*Id.* 47:6-21.) On August 1, Plaintiff arrived for work at 7:30 a.m. and left at 9:00 p.m. (*Id.* 47:22-48:7.)

Shortly before 1 a.m. on August 2, 2011, Plaintiff began sending text and email messages to Edger. (Yarberry Dep. 59:7-60:5; Edger Dep., 20:1-9, Ex. 15).  Plaintiff's text messages included:

• I'll be there at 7 ish with a game plan for the walkthrough. Gary eck has a long drive from mason, oh. It's 5 hrs to be exact. Lol.

• I'll be able to sleep finally if I know how [*sic*] were gonna conquer the entire region of Pittsburgh. But I'm not trying to make Topher call you or anything. Haha

• You're probably a he'll [*sic*] of a poker player, Brett. Not saying a peep. Lol

• I need to go to the doctor. I might keel over and"[m]y fiancé is trying to find me a doctor. Whole body is shaking.

(Yarberry Dep. Ex. 15); (Edger Dep., 20:1-9, Ex. 15.)

A little over an hour later, Plaintiff entered the Cranberry store, disarmed the alarm, and locked himself inside. (Yarberry Dep. 57:15-58:2, 79:25-80:11; Zimmerman

Dep. 7:24-8:10, 11:4-11 Exs. 14, 28). He sent another text message to Edger stating: "FYI I'm at the store sleeping on a tempur pedic. Lol. My freaking fiancé is driving me nuts." (*Id.*, Ex. 15.) A few minutes later he sent Edger an email stating:

> MY FIANCE IS DRIVING ME CRAZY OVER EVERY LITTLE
> DOLLAR IVE [*sic*] SPENT THIS WEEK AND SHES [*sic*]
> FREAKING OUT BECAUSE I SPENT $50 FOR PIZZAS FOR
> THE TEAM. SHE JUST DOESN'T GET IT. I'M NOT
> ALLOWED TO USE THE SPA AT THE HOTEL FOR
> "LIABILITY REASONS" AND I CANT [*sic*] FALL ASLEEP.
> IM [*sic*] AT THE STORE AND IM [*sic*] GONNA SLEEP ON A
> TEMPUR PEDIC MATTRESS TIL 6AM, THEN GO BACK TO
> THE HOTEL AND SLEEP. I HAVENT [*sic*] SLEPT SINCE
> JULY 20TH WHEN THIS CRAZINESS STARTED. ILL [*sic*]
> LEAVE MY PHONE ON FOR YOU TO CALL ME IF YOU
> NEED ME.

(Doc. 42, Ex. C, Bush Aff, ¶¶ 3-4, Ex. 24).

Plaintiff then proceeded to access the store's safe, roam around the store, play games on the floor model computers for several hours, and attempt to sleep on a Tempur-Pedic display mattress. (Yarberry Dep. 55:8-56:3, 56:10-12; Zimmerman Dep. 7:24-8:10, 13:4-9, 15:2-13, Ex. 28.) Plaintiff remained in the store into the early hours of August 2, 2011. (Edger Dep. 36:5-12; Bush Aff. ¶ 3, Ex. 25.)

Edger first read Plaintiff's text messages and emails upon waking up around 6:00 a.m. on August 2 and was immediately concerned at Plaintiff's apparent violation of company policy by being in the store alone after hours. (Edger Dep. 21:3-13, 22:2-14.) After attempting to reach Plaintiff by phone without success, Edger and Plaintiff exchanged a series of text messages discussing whether the two could meet in person or talk by phone. (Edger Dep. 26:13- 27:16, 28:8-16, 29:21-30:11, Ex. 15, pp. 4-5.) During that exchange, Plaintiff said, among other things:

- Hey man I'm sick not coming in today, and

- Can't man I'm puking. Didn't sleep. I wasn't lying when I said I hadn't

    slept for 16 days straight. I'm barely surviving.

    *Id.*

Edger concluded the exchange by telling Plaintiff he should seek medical attention if he felt that was needed. (Edger Dep. 30:19-31:2, Ex. 15, p. 6). At 3:47 p.m., Plaintiff sent Edger a text message stating that he was taking the day off. (Edger Dep. 34:22-35:4, Ex. 15, p. 7). hhgregg allowed him to do so. (Yarberry Dep. 75:11-21.) At 6:49 p.m., Plaintiff sent Edger a text stating that he was getting an ambulance ride to the hospital and was going to need the next day off. (Edger Dep. 35:5-17, Ex. 15, p. 7).

In addition to the emails and text messages sent to Edger on August 2, 2011, Plaintiff sent a series of emails throughout the day to various other members of hhgregg management. (Bush Dep., 24:11-15; Zimmerman Dep. 7:24-8:4; Bush Aff. ¶¶ 3-4, Exs. 26 and 28). His first email, sent at 6:35 a.m., included the following:

> I AM IN CRANBERRY PA. THIS IS MY FRIST [*sic*] DAY AT THE STORE, I JUST FINISHED ACE TRAINING AND WAS EMPORED [*sic*] TO COME TOT HIS [*sic*] STORE. I UIPROOTED [*sic*] MY FIANCE AND I. THE ALARM IS GOING OFF BECAUSE I DONT [*sic*] KNOW HOW TO STOP IT. I TRIED TO FIRE 2 FORMER SEARS EMPLOYEES BUT MY RM BRETT EDGER WOULDNT [*sic*] LET ME, HE SAID IT OWOULD [*sic*] BE OK AND THAT THEY WOULD STILL BE HERE. THEYRE [*sic*] STILL HERE. OPLEASE [*sic*] CONTACT ME IMMEDIATELY. IM VERY SCARED.

(Bush Dep. Ex. 26).

At 8:32 a.m., Plaintiff sent an email stating that his fiancé was coming to take him to the hospital to sleep and that he would be okay if he slept. (Bush Aff. ¶ 3; Bush Dep. 27:6-22, Ex. 26). At 10:36 a.m., Plaintiff wrote that he was at the Childrens' Hospital

4

and did not think he needed medication – "just some fun" – and that his fiancé was going to take him to a movie or "maybe get a beer." (Bush Dep. 49:7-12, 53:19-54:12; Bush Aff. ¶¶ 3-4, Ex. 28, p. 2).

One of the recipients of Plaintiff's early morning emails alerted hhgregg's National Asset Protection Manager Todd Zimmerman, who then began an investigation into Plaintiff's conduct. (Zimmerman Dep. 7:8-23). After reviewing the store's video surveillance footage, Zimmerman asked Edger to instruct Plaintiff to take a drug test. (Edger Dep. 31:8-21). Plaintiff declined, and instead said that he was going to sit and "chillax." (Edger Dep. 32:14-23).

Edger reported Plaintiff's response to Zimmerman, and Zimmerman then called and spoke to Plaintiff. (Edger Dep. 33:1-8; Zimmerman Dep. 22:12-22; Ex. 15, p. 6.) Zimmerman asked Plaintiff why he was in the store at 2:15 a.m., and Plaintiff began talking rapidly. (Zimmerman Dep. 23:2-24). Plaintiff told Zimmerman that Edger stressed Plaintiff out too much, the hotel's bed was really rough, there wasn't anything good on TV, and the hotel would not provide him with a sauna to relieve his stress. Zimmerman asked Plaintiff to stop talking so that he could ask further questions, but Plaintiff repeatedly refused to do so. (Zimmerman Dep. 23:10-24:15, Ex. 28).

At that point, Zimmerman suspended Plaintiff pending further investigation. (Zimmerman Dep. 25:6-14). Zimmerman also contacted Human Resources to ensure that they would arrange for Plaintiff to take a drug screen. (Zimmerman Dep. 25:15-26:13). At 12:22 p.m. on August 3, 2011, Zimmerman submitted his written report to hhgregg's Human Resources Department recommending that Plaintiff not be allowed access to any hhgregg store because he had demonstrated that he did not use his

access to the building responsibly and did not cooperate in Zimmerman's investigation. (Zimmerman Dep. 7:24-8:4, Bush Dep. 49:6-12, Ex. 28).

hhgregg's Associate Relations Manager Cynthia Bush spoke with Edger about the situation on August 2. (Bush Dep. 28:12-22).   She received Zimmerman's investigative report on August 3. (*Id.* 40:3-24, 49:6-15, Ex. 26).   She also reviewed emails that Plaintiff had sent and Plaintiff's personnel file. (*Id.* 24:13-17, 28:12-24, 29:13-31:6, 64:25-65:3; Bush Aff. ¶3).   Bush determined that Plaintiff should be terminated because his after-hours behavior in the Cranberry store and failure to cooperate in hhgregg's investigation demonstrated a lack of professional judgment and violated the Company's safety, detrimental conduct, and failure to cooperate policies. (Bush Dep. 60:25-61:23, 69:6-70:2, 92:24-93:24, Ex. 30; Bush Aff. ¶ 5, Bush Aff. Exhibit 1;7 *see also* Zimmerman Dep. 48:3-8, 48:16-49:3).

At 1:03 p.m. on August 3, 2011, Bush sent an email to Edger advising him to discharge Plaintiff and providing him with content for the discharge documentation. (Bush Dep. 42:24-43:9; Edger Dep. 44:4-21, Exs. 20, 27).   She subsequently drafted a letter to Plaintiff notifying him of his discharge and sent it to Edger for signature.  (Bush Dep. 68:18-69:15, Ex. 30).   At 5:00 p.m. on August 3, Plaintiff sent an email to various hhgregg managers –but not Bush – apologizing for his behavior at the Cranberry store and stating that he was in the Western Psychiatric Institute and Clinic. (Yarberry Dep. 63:24-64:3,  65:10-15;  Ex. 16).   One  of  Plaintiff's  August 3rd emails to senior management contained a request for a leave of absence to undergo treatment.  (Bush Dep. Ex. 32).  Specifically, he stated: "I plan on being released from the clinic on Friday

or Saturday and maybe taking a day or two off work. I would love nothing more than to still have an opportunity at HH Gregg." (Bush Dep. Ex. 32).

On August 8, 2011, Plaintiff's father sent an email to various hhgregg managers, but did not include Bush, stating that Plaintiff could be released in a few days if he continued to sleep and eat regularly. (Bush Dep. 83:21-84:11; Bush Aff. ¶¶ 3-4, Ex. 34). One of the recipients forwarded the email to Bush, who then contacted Plaintiff's father by phone to inform him that Plaintiff's employment had been terminated days earlier. (Bush Aff. ¶ 3; Bush Dep. 84:1-5, 85:7-11, 18-25, Ex. 34.)

On August 12, 2011, Dr. Michael Marcsisin emailed a letter to Bush stating that Plaintiff had been hospitalized for treatment of a manic episode that started in mid-July. (Yarberry Dep. 72:16-73:13, Bush Dep. 96:14-97:4; Exhs. 18 and 36). Dr. Marcsisin further stated that Plaintiff's manic episode resulted from Bipolar I Disorder, and that his manic episode likely led to his unusual behaviors prior to hospitalization. *Id.*

On August 16, 2011, Plaintiff called Bush and asked to be reinstated based on his doctor's statement that his behavior likely was caused by Bipolar Disorder. (Bush Dep. 99:25- 101:11, Ex. 37.) On August 17, 2011, Bush told Plaintiff that the termination decision stood. (Bush Dep. 102:25-103:9, Ex. 37.)

Thereafter, Plaintiff filed a charge of discrimination on the basis of disability with the Equal Employment Opportunity Commission. (Doc. 1, ¶ 5). Plaintiff received a Notice of Rights letter from the EEOC on July 2, 2012. *Id.* Plaintiff then filed the instant action on November 14, 2012, alleging that hhgregg discriminated against him on the basis of his alleged disability in violation of the Americans with Disabilities Act ("ADA"). This matter is now before the Court on the parties cross motions for judgment.

## II. Analysis

### A. Summary Judgment Standard of Review

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

8

The non-moving party's evidence "is to be believed, and all *justifiable* inferences are to be drawn in his favor." *Id.* at 255 (emphasis added). The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (citation omitted). It is the Plaintiff's burden to point out record evidence to support his claims. "[T]he Court has no duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claims." *Abdulsalaam v. Franklin County Bd. Of Com'rs*, 637 F. Supp.2d 561, 576 (S.D. Ohio 2009) (citing *Williamson v. Aetna Life Ins. Co.,* 481 F.3d 369, 379 (6th Cir. 2007)).

### B. The Parties Cross-Motions for Summary Judgment

As detailed above, Plaintiff's complaint alleges that Defendant discriminated against him based on his disability in violation of Federal law. Specifically, Plaintiff argues that he has presented directed evidence that he was terminated because of his disability. In this regard, Plaintiff asserts that hhgregg terminated Yarberry for his behavior on August 1 and 2, 2011— behavior indisputably caused by his disability. Plaintiff now moves for partial summary judgment, arguing that the undisputed facts establish that hhgregg denied Plaintiff a reasonable accommodation in violation of the ADA. (Doc. 40).

hhgreeg also moves for summary judgment. (Doc. 41). hhgreeg argues that

Plaintiff cannot establish a *prima facie* case of disability discrimination, because he cannot show that hhgregg had knowledge of his disability.  Assuming arguendo, that Plaintiff can establish a *prima facie* case of discrimination, hhgregg asserts that it had a legitimate non-discriminatory reason for terminating Plaintiff's employment and Plaintiff cannot show that hhgregg's proffered reason for his termination is a pretext for discrimination.

Upon careful review and more fully explained below, the undersigned finds that hhgregg was not aware that Plaintiff was suffering from a disability prior to its decision to terminate his employment.  Accordingly, hhgregg's motion for summary is well-taken and should be granted.

### C. Defendant is entitled to Judgment as a Matter of law

1. *Direct and Circumstantial Evidence.*

Title I of the ADA provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).

A plaintiff may establish a *prima facie* discrimination claim by either direct or circumstantial evidence. *Younis v. Pinnacle Airlines*, Inc., 610 F.3d 359, 363 (6th Cir. 2010).  "Direct evidence of discrimination is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir. 2003) (en banc).  Under the direct method, a claimant relies on evidence that requires

no inference or presumption to prove the existence of a fact. *Id.* If the evidence requires the jury to infer some further fact, it is not direct evidence. *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1081 (6th Cir. 1994). Once direct evidence of intentional discrimination is shown, the burden shifts to the employer to proffer a non-discriminatory reason for the employer's action. *See Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1184 (6th Cir.1996) (eliminating the need for further burden shifting where direct evidence is available).

"Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.* A plaintiff who lacks direct evidence of discrimination may establish a prima facie case of discrimination through circumstantial evidence under the burden-shifting frame work of *McDonnell Douglas.* Under the burden-shifting framework of *McDonnell Douglas,* the plaintiff must first establish a *prima facie* case under the relevant statute. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. "A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1114 (6th Cir. 2001).

To make out a *prima facie* case of disability discrimination through indirect evidence under Title I, a plaintiff must show that "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Macy v. Hopkins Cnty. Sch. Bd. of*

*Educ.*, 484 F.3d 357, 365 (6th Cir. 2007) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)). Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision. If the defendant makes the appropriate showing, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason was a pretext for discrimination. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Pursuant to this framework, the Court will first determine whether Plaintiff has stated a *prima facie* case of disability discrimination for his termination and/or his claim for failure to accommodate. If he does, the Court will then determine whether Defendant has proffered a legitimate, non-discriminatory reason for its conduct. If Defendant satisfies these criteria, the Court will inquire as to whether a reasonable finder of fact could find that Plaintiff has shown that the proffered reasons were a pretext for disability discrimination or retaliation. If Plaintiff has produced evidence from which a jury could conclude that Defendants' proffered reasons for their actions were a pretext for discrimination or retaliation, Defendants' motion for summary judgment must fail.

## 2. *Prima Facie Case*

Plaintiff asserts that he has direct evidence of discrimination. Notably, Plaintiff contends that hhgregg admits that it terminated Yarberry for his behavior on August 1 and 2, 2011— behavior Plaintiff asserts was indisputably caused by his disability. Plaintiff's contention is not well-taken in this regard. As noted by hhgregg, the distinction between misconduct and the medical condition that reportedly caused it is a legitimate and outcome determinative distinction in this case. Notably, the Sixth Circuit

has distinguished between "discharging someone for unacceptable misconduct and discharging someone because of the disability," allowing that only the latter violates anti-discrimination statutes. *Chandler v. Specialty Tires of Am. (Tennessee), Inc.*, 134 F. App'x 921, 926 (6th Cir. 2005) (quoting *Maddox v. Univ. of Tenn.,* 62 F.3d 843, 847 (6th Cir.1995)). Thus, Plaintiff's contention requires the Court to reach a conclusion by making an inference. As noted above, if the evidence requires the jury to infer some further fact, it is not direct evidence. *Manzer,* 29 F.3d at 1081.

In any event, Plaintiff also asserts that he can establish his discrimination claims based on circumstantial evidence. As detailed above, to make out a *prima facie* case of employment discrimination through indirect evidence under Title I, a plaintiff must show that "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)).

### 1. *Plaintiff was not "regarded as" having a disability*

hhgregg argues first that Plaintiff cannot satisfy the first element of a *prima facie* case, which requires Plaintiff to be disabled within the meaning of the ADA. A person is "disabled" for the purposes of the ADA if he has:

(A) a physical or mental impairment that substantially limits one or more of

the major life activities of such individual;

(B) a record of such an impairment; or

13

(C) being regarded as having such an impairment

42 U.S.C. § 12102(1).

An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C.A. § 12102 (3)(A)(West).

Plaintiff's complaint alleges that hhgregg regarded him as disabled because "only after learning that he did not test positive for any drugs which may explain his erratic behavior did it terminate his employment." (Doc. 1, ¶ 27.). hhgregg, however, asserts that at the time Bush made the decision to terminate Plaintiff, there is no evidence that Plaintiff was "regarded as" suffering from a disabling impairment. In response to hhgregg's motion for summary judgment, Plaintiff argues that it is undisputed that he suffers from bipolar disorder, an impairment that imposes a substantial limitation on major life activities.

This argument, however, fails to establish that Bush terminated Plaintiff's employment "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* As more fully discussed below, the record does not indicate that Bush was aware of Plaintiff's Bipolar Disorder at the time she made the termination decision. (*See* Bush Dep. 47-48, 54, 61, 66-68, 92, 93).

*2. hhgregg did not have knowledge of Plaintiff's disability prior to his termination.*

Even assuming Plaintiff could establish the that he suffered from a disability as defined by the ADA, hhgregg further argues that Plaintiff cannot establish the fourth element of prima facie case of disability discrimination, *i.e.* the employer knew or had reason to know of the plaintiff's disability.

It is well established in the Sixth Circuit that an employee cannot be considered to have been fired "on the basis of disability" unless the individual decision-maker who fired the individual had knowledge of that disability, *see Burns v. City of Columbus, Dep't of Pub. Safety, Div. of Police,* 91 F.3d 836, 844 (6th Cir.1996) (holding that plaintiff could not establish a *prima facie* case of disability discrimination because he had failed to show that the members of a review board that made the ultimate decision to terminate him knew of his disability); *Landefeld v. Marion Gen. Hosp., Inc.,* 994 F.2d 1178, 1181–82 (6th Cir.1993) (holding that because "it was the Board of Directors, and not the president, who suspended plaintiff," plaintiff could not state a claim of disability discrimination where "[t]here is no showing that the Board had any knowledge of plaintiff's mental illness"); *Moloney v. Home Depot U.S.A., Inc.,* 2013 WL 460684, No. 11–10924, at *1 (E.D.Mich. Feb. 7, 2013) ("[B]ecause Keith Stevens made the decision to terminate Plaintiff's employment, ... it is Stevens's knowledge, as the decision-maker, that is relevant."); *see also Cordoba v. Dillard's, Inc.,* 419 F.3d 1169, 1185 (11th Cir.2005) ("Once the issue is framed clearly, it is evident that an employee cannot be fired 'because of' a disability unless the decision-maker has actual knowledge of the disability."); *Hedberg v. Ind. Bell Tel. Co., Inc.,* 47 F.3d 928, 932–33 (7th Cir.1995)

(holding that lack of knowledge of decision-maker is fatal to a *prima facie* case under the ADA because "it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee 'because of' a disability unless it knows of the disability")

Thus, as the ADA demands that the employee's disability be "known" to the employer for liability to attach, a plaintiff must generally also have informed his employer of his disability and requested *an* accommodation prior to the time at which an employer takes adverse action against a disabled employee. *See Monette,* 90 F.3d at 1186 n. 13 (requiring a plaintiff to show "actual or constructive knowledge of the disability as part of a *prima facie* case") (internal quotation marks omitted); *Crocker v. Runyon,* 207 F.3d 314, 319-20 (6th Cir.2000) (employer has no obligation to offer accommodation where employee never requested one) (citing *Kaltenberger v. Ohio College of Podiatric Med.,* 162 F.3d 432, 437 (6th Cir.1998)).

Here, the undersigned agrees that Plaintiff has failed to carry his burden of showing that Cynthia Bush, the sole decision-maker[2] with respect to Plaintiff's firing, knew of his disability.  As detailed above, Bush determined that Plaintiff should be terminated because his after-hours behavior in the Cranberry store and failure to cooperate in hhgregg's investigation demonstrated a lack of professional judgment and violated the Company's safety, detrimental conduct, and failure to cooperate policies. (Bush Dep. 60:25-61:23, 69:6-70:2, 92:24-93:24, Ex. 30; Bush Aff. ¶ 5, Bush Aff. Exhibit

---

[2]  Plaintiff argues that Associate Relations Manager Cynthia Bush was not the sole decision maker regarding Plaintiff's termination because she spoke to and consulted with Regional Manager Brett Edger, Human Resource Officer Charles Young, and legal counsel.  However, while she may have consulted with others, both Bush's and Edger's testimony clearly indicates that Bush made the decision to terminate Plaintiff.  (Bush dep. at 60, Edger dep. at 51).

1;7 see also Zimmerman Dep. 48:3-8, 48:16-49:3).  Specifically, at 1:03 p.m. on August 3, 2011, Bush sent an email to Edger advising him to discharge Plaintiff and providing him with content for the discharge documentation.  (Bush Dep. 42:24-43:9; Edger Dep. 44:4-21, Exs. 20, 27).  She subsequently drafted a letter to Plaintiff notifying him of his discharge and sent it to Edger for signature. (Bush Dep. 68:18-69:15, Ex. 30.)

In his emails and text messages to hhgregg prior to his termination, Plaintiff repeatedly attributed his behavior to a lack of sleep, his recent move and stress related to his engagement. (Yarberry Dep. 59:7-60:6, 70:23-72:2; Edger Dep. 36:5-20; Bush Dep. 12:4-15, Exs. 15, 24-25.)  Plaintiff asserts, however, that his text messages contained sufficient information to establish that hhgregg had knowledge of his disability.  As early as the morning of August 2, 2011, Plaintiff contends that hhgregg and several of its employees, including Bush and Edger, knew that Yarberry was suffering from a medical condition. In a text message that morning, Yarberry told Edger that he had not slept in 16 days and he needed to "go to the doctor." (Yarberry Dep. Ex. 15).

In an email to Edger, which Edger forwarded to Bush, Yarberry said that his fiancée was concerned for his health and wanted him to check into a hospital.  (Bush Dep. Ex. 25).  The email also stated: "I lieterally[sic] havent[sic] slept since July 19th . . . ."  (Bush Dep. Ex. 25).  Further, on August 3, 2011, around 4:30 p.m[3]., Yarberry's fiancée spoke with Edger and informed him that Yarberry had been committed to a psychiatric hospital. (Doc. 40, Ex. 1, p. 1-2).  Edger told Bush about the call that same

---

[3]  As noted above, Bush sent an email to Edger advising him to discharge Plaintiff and providing him with content for the discharge documentation, at 1:03 p.m. on August 3, 2011, three hours before Edgar spoke to Plaintiff's fiancée.

day. (Bush Dep. 43-44; Bush Dep. Ex. 27). Yarberry also sent two emails to several of hhgregg management level employees on August 3, 2011, stating that he was "getting help" at the Western Psychiatric Institute and Clinic and that "they put me down as 'involuntary. . . .'" (Bush Dep. Ex. 32, 33). Those emails were forwarded to Bush the following morning, August 4. (Bush Dep. Ex. 32, 33). Accordingly, considered in the context of the entire record, Plaintiff asserts that "it is clear that hhgregg knew Yarberry was more than stressed and sleep deprived; it knew he was suffering from a substantially limiting mental impairment that resulted in an involuntary commitment to a psychiatric hospital." (Doc. 48 at 8).

Such evidence, however, does not establish that hhgreeg had actual or constructive knowledge of Plaintiff's disability. An employer "knows" of a disability when an employee tells the employer of his or her "condition." *Hammon*, 980 F. Supp. a 926, quoting, *Schmidt v. Safeway Inc.*, 864 F.Supp. 991, 997 (D.Or.1994). *See also Alexander v. Trilogy Health Servs., LLC,* No. 1:11cv295, 2012 WL 5268701, at *12 (S.D.Ohio Oct. 23, 2012) ("What matters under the ADA ... [is] whether the employee ... provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.") (internal quotations omitted). Mere knowledge of an employee's *symptoms* does not equate to knowledge of his *disability. Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) (employer had no knowledge of plaintiff's disability merely because employer knew of several of his symptoms*); Brown v. BKW Drywall Supply, Inc.*, 305 F.Supp.2d 814, 829 (S.D.Ohio 2004) ("Knowing that an employee has health problems, however, is not the same as knowing that the employee

18

suffers from a disability").

As noted by this Court in *Brown*, "many medical conditions do not qualify as disabilities for purposes of the ADA.  Often, the only way an employer can know whether an employee's health problems constitute a disability is if the employee provides it with some form of medical documentation."  *Id.* at 829.  Here, it is undisputed that Plaintiff did not provide hhgregg with any documentation of a disability prior to his termination.  Without such documentation, hhgregg could only speculate as to the cause and duration[4] of Plaintiff's behavior and/or the reason for Plaintiff's hospitalization.  However, an "employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation."  *Hammon*, 165 F.3d at 449-50.    Notably, Plaintiff himself did not learn that an identifiable mental condition "likely" caused his behavior until several days after Bush made her decision, and that diagnosis was not communicated to hhgregg until Dr. Marcsisin's August 12 email. (Yarberry Dep. 69:4-17, 70:9-22, 72:16-73:13; Bush Dep. 42:24-43:9, 49:2-5, 69:6-15, 96:14-97:4, Exs. 18, 27, 30, 36.)

In light of the foregoing, the undersigned finds that Plaintiff has failed to establish a *prima facie* case of disability discrimination.

---

[4]  Notably, "short-term, temporary restrictions are not substantially limiting." *Roush v. Weastec, Inc.,* 96 F.3d 840, 843 (6th Cir.1996) (citing *Hamm v. Runyon,* 51 F.3d 721, 725 (7th Cir.1995)); *see Toyota,* 534 U.S. at 198, 122 S.Ct. 681 (stating that "[t]he impairment's impact must also be permanent or long term") (citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii)); *see also Fagan v. United Int'l Ins. Co.,* 128 F.Supp.2d 182, 185 (S.D.N.Y.2001) (stating that a "transitory impairment is not considered substantially limiting") (citation omitted). Likewise, "[i]ntermittent, episodic impairments" generally are not considered to be disabilities. *Johnson,* 101 F.Supp.2d at 574 (quoting *Vande Zande v. Wis. Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir.1995)); *see also EEOC v. Sara Lee Corp.,* 237 F.3d 349, 352 (4th Cir.2001) (holding that epileptic's seizures did not substantially limit a major life activity and stating, "[t]o hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds").

*3. hhgregg's legitimate non-discriminatory reason for Plaintiff's termination and Plaintiff's arguments regarding pretext*

Even if the Plaintiff could establish a *prima facie* case of discrimination, hhgregg has proven a legitimate, nondiscriminatory business purpose for its actions.  Namely, Plaintiff violated multiple company policies when he entered the Cranberry store in the early morning hours, entered the store's safe, played on the store's computers, slept on a TempurPedic mattress in the store, and failed to answer Zimmerman's questions during the investigation. (Bush Dep. 15:1-4, 61:11-15, 67:10-19; Bush Aff. ¶5, Bush Aff. Exhibit 1; Edger Dep. 23:18-24:2, 25:15- 26:7: Zimmerman Dep. 47:3-48:2).

Plaintiff contends, however, the hhgregg cannot articulate a non-discriminatory justification for Plaintiff's termination because hhgregg terminated Plaintiff for conduct resulting from his disability, which is the same as terminating because of his disability. *See Chandler, supra*; *Gilday v. Mecosta County*, 124 F.3d 760, 766 (6th Cir. 1997) (Diabetic employee whose blood sugar spikes caused abrasive behavior not unqualified because behavior caused by disability).  Plaintiff's contention is unavailing.  As noted by hhgregg, Plaintiff engaged in misconduct *prior* to notifying the employer of a disability. As thoroughly explained above, hhgregg's decision to terminate Plaintiff could not have been based on discriminatory animus because they did not have actual or constructive knowledge of Plaintiff's disability at the time Bush made the decision to terminate Plaintiff.

Next, with respect to pretext, Plaintiff fails to provide any evidence to establish that the stated reasons for Plaintiff's termination had no basis in fact; did not actually motivate hhgregg's decision; or were insufficient to warrant the decision.  See *Manzer,*

20

29 F.3d at 1084. Notably, Plaintiff argues that hhgregg's cited basis for its discharge decision is a pretext for disability discrimination is his assertion that he would not have been discharged if his behavior had been caused by drugs or alcohol. Plaintiff further argues that the ADA permits an employer to terminate an employee for misconduct caused by drugs and alcohol and/or threats of violence. 42 U.S.C. § 11 12114(c)(4). *See Green v. Burton Rubber Processing, Inc.,* 30 Fed.Appx. 466, 470 (6th Cir. 2002). Neither of which occurred here. As noted above, at hhgregg request, Plaintiff completed a drug and alcohol screen, which was negative. (Bush Dep. Ex. 29). Yarberry did not exhibit violent behavior or pose a threat to anyone at hhgregg.

As noted by hhgregg, the rehabilitation provisions of hhgregg's Drug-Free/Alcohol-Free Workplace Policy, by their own terms, apply only to certain violations of that policy and do not purport to govern the outcome of any situation in which other policies are also implicated. (Doc. 47, Ex. C, Bush Second Aff., ¶¶ 5-6, Exh. 1). Furthermore, at oral argument, counsel for hhgregg indicated that an employee violation of the drug and alcohol policy involved discretion of the decision maker and were evaluated on a case by case basis. Thus, there is no evidence that if Plaintiff had failed the drug test, he would not have been terminated.

In light of the foregoing, Plaintiff has failed to rebut hhgreg's legitimate non-discriminatory reasons for his termination and has failed to produce any evidence that hhgregg intended to discriminate against Plaintiff on the basis of his disability. *See Thurman*, 90 F.3d at 1166 (citing *Hicks*, 509 U.S. at 502) ("The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for discrimination and that the employer intended to discriminate on the basis of race.)"

The undersigned recognizes the purported unfairness of hhgregg's decision to terminate Plaintiff.  However, "illegal discrimination is indeed something different from simple unfair treatment*."  Timmerman v. IAS Claim Services Inc.*, 138 F.3d 952, 1998 WL 110078, at *2 (5th Cir. Feb. 20, 1998)(table).  "Title VII ... do[es] not protect against unfair business decisions[,] only against decisions motivated by unlawful animus."  *Id.* (*quoting Nieto v. L & H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997).  Here, there is no evidence that Plaintiff's termination was motivated by unlawful animus.

### III. Conclusion

For these reasons, **IT IS THEREFORE RECOMMENDED THAT** Plaintiff's motion for partial summary judgment (Doc. 40) be **DENIED**; Defendant's motion for summary judgment (Doc. 41) be **GRANTED** and this case be **TERMINATED** on the active docket of the Court.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOHN YARBERRY,

          Plaintiff,                              Case No. 1:12-cv-611

    v.                                        Weber, J.
                                                Bowman, M.J.

GREGG APPLIANCES, INC.,

          Defendant.

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

23